**Connie D. WILLIAMS, Appellant,**

v.

**Andrea JACOBS, Respondent.**

**No. WD53586.**

Missouri Court of Appeals,
Western District.

April 14, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1998.

Application for Transfer Denied
Aug. 25, 1998.

Sharon M.B. Pigeon, Howard E. Bopdney, Kansas City, for appellant.

Richard F. Moden, Daniel Robert DeFoe, Kansas City, for respondent.

Before HOWARD, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Connie Williams appeals from the trial court's judgment in favor of Andrea Jacobs in Ms. Williams' personal injury action resulting from an automobile collision. Ms. Williams raises six points on appeal. First, she contends that the trial court erred in excluding evidence concerning her medical treatment and injuries because such evidence was relevant and material to the extent of her personal injury. Second, she alleges that the trial court erred in refusing to instruct the jury on the appropriate definition of negligence in Missouri Approved Instructions because § 304.010.1, RSMo 1994, mandates the use of that definition. As her third and fourth points, Ms. Williams contends that the trial court plainly erred by not correcting Ms. Jacobs' mischaracterization of the burden of proof in closing argument and by disregarding the plain language of the petition in concluding that Ms. Williams did not make a claim for property damage. Fifth, Ms. Williams alleges that the verdict was against the weight of the evidence. Finally, Ms. Williams claims error on the part of the trial court for failing to maintain a fair and impartial appearance and demeanor during the proceedings.

The judgment of the trial court is affirmed.

## Factual and Procedural Background

On appeal, this court considers the facts in the light most favorable to the jury's verdict, considering only that evidence which supports it and disregarding contrary evidence and inferences. *Tate v. Golden Rule Ins. Co.*, 859 S.W.2d 831, 834 (Mo.App.1993). On December 23, 1988, Ms. Williams and Ms. Jacobs were involved in an automobile accident. Ms. Williams, her son, Scott, and his girlfriend had just finished eating lunch and were going to Bannister Mall to do some Christmas shopping. Ms. Williams drove her own car while her son and his girlfriend rode in his car because they were going different places after shopping. Immediately prior to the accident, Ms. Williams' vehicle was stopped at a traffic light at the intersection of 95th Street and Blue Ridge Boulevard in Kansas City, Missouri, and her son's automobile was stopped in the lane adjacent to Ms. Williams. Ms. Jacobs was in a car stopped two to three feet directly behind Ms. Williams. Because of the dense holiday shopping traffic, both Ms. Williams and Ms. Jacobs were stopped at the light for two full cycles. Ms. Jacobs noticed that the left lane was turning left and began to move forward at approximately one or two miles per hour. However, the light for traffic going straight through the intersection had not turned

green yet and Ms. Williams was still at a complete stop. As a result, Ms. Jacobs' car tapped the rear bumper of Ms. Williams' vehicle.

Although there was only about half a car length between Ms. Williams and the car in front of her, Ms. Williams' car was not forced into the car in front of it, and it remained in its lane during the accident. Both Ms. Williams and Ms. Jacobs exited their respective vehicles. Scott Williams also got out of his car to check on his mother. When Ms. Jacobs asked Ms. Williams if she was all right, Ms. Williams responded that she was fine; the accident had just scared her. The parties agreed to go to the parking lot of a nearby fast food restaurant to exchange information. The impact caused a quarter-sized ding in the rear bumper of Ms. Williams' vehicle, and its right front tire was slowly losing air. There was no damage to Ms. Jacobs' automobile. While at the parking lot, Ms. Jacobs again asked Ms. Williams if she was injured, to which Ms. Williams responded that she was fine. The parties exchanged information and parted. Thereafter, Ms. Williams went to a nearby police station and filed an accident report. She then drove home.

As a result of the accident, Ms. Williams filed suit against Ms. Jacobs claiming that Ms. Jacobs negligently, carelessly and recklessly operated her car "so as to permit said motor vehicle to collide violently with the rear of the aforesaid [car] being driven by Plaintiff." Ms. Williams claimed that "her entire body was wrenched, broken, bruised displaced, contused, torn, strained and sprained," and that she sustained injuries to her "entire head and eyes, to her neck, to her back and to her upper extremities." She sought damages in excess of $15,000. The day prior to trial, the parties stipulated that Ms. Williams' claim of injuries would be limited to the eleven-month period from December 1988 to November 1989, ending when she was injured in another car accident on November 19, 1989. The case proceeded to trial. The jury entered a defendant's verdict

in favor of Ms. Jacobs, and the trial court entered judgment in accordance with the jury's verdict. Ms. Williams' motion for new trial was denied, and she filed a timely appeal in this court.[1]

## Standard of Review

"In reviewing the verdict of a jury in a civil case, the appellate court does not 'determine the credibility of the witnesses, resolve conflicts in testimony, or weigh the evidence.'" *Brandt v. Csaki,* 937 S.W.2d 268, 273 (Mo. App.1996) (quoting *Powell v. Norman Lines, Inc.,* 674 S.W.2d 191, 197 (Mo.App.1984)). These are questions reserved for the jury. *Powell,* 674 S.W.2d at 197. The evidence is viewed in a light most favorable to the verdict, disregarding all contrary evidence and inferences. *Tate,* 859 S.W.2d at 834.

## Points on Appeal

### Point I—Exclusion of Evidence of Medical Treatment and Expenses

As her first point on appeal, Ms. Williams claims that the trial court erred by refusing to allow her to testify at trial concerning approximately three months of medical treatment she received from Drs. Fenton Williams and S.R. Davuluri. She also claims that the trial court erred by refusing to admit medical records and bills from Drs. Williams and Davuluri, in addition to records and bills from diagnostic tests, treatments and prescriptions ordered by these physicians. Ms. Williams argues that this evidence was relevant to show the extent of her personal injuries resulting from the accident and her expenses for the treatment of these injuries. The trial court refused to admit this evidence because Ms. Williams failed to establish a proper foundation that the claimed injuries were caused by the accident and that the treatment was medically necessary as a result of the accident.

■ On appeal from the exclusion of allegedly admissible evidence, this court accords substantial deference to the trial court's deci-

---

1. Ms. Jacobs filed a motion to dismiss the appeal and Ms. Williams filed a motion to dismiss Ms. Jacobs' brief, both of which were taken with the case. We have examined the allegations of the motions and find that they are meritless. The motions are denied.

sion and will reverse that decision only if the trial court abused its discretion. *Brown v. Hamid,* 856 S.W.2d 51, 56 (Mo. banc 1993). In this case, the trial court allowed Ms. Williams to testify that, right after the accident, her lower back was "kind of hurting." Although she was involved in a whiplash accident in 1984, she testified that she had been without symptoms from that incident for over two years when the collision with Ms. Jacobs occurred. When she went home after the accident, Ms. Williams was "feeling a little bit sore" through her shoulders and neck. Over the weekend, she treated her symptoms with a hot water bottle and over-the-counter pain medications. She was able to see her family doctor, Dr. Williams, on Tuesday about her pain from the accident with Ms. Jacobs. She later saw Dr. Davuluri, a neurologist, and he referred her to Dr. Arnold Schoolman. Ms. Williams testified that the pain in her neck, shoulder and low back from the accident was continuous until she was referred to Dr. Schoolman on April 5, 1989. She testified to various tests performed at his behest, including a CAT scan, EMG, and x-rays. The results of these tests were normal. Dr. Schoolman prescribed physical therapy three to four times a week, consisting of hot packs, ultrasound, and massage. He also prescribed home exercises, a back brace and a TENS unit for pain. Ms. Williams was under Dr. Schoolman's care when she was involved in a subsequent car accident in November of 1989.

On cross-examination, Ms. Williams admitted that in her answers to Ms. Jacobs' interrogatories and in her deposition, she had stated that she injured her low back and her right shoulder in the wreck, but that she did not mention that her neck was injured. In response to a deposition inquiry whether she had any injuries other than the low back and right shoulder, Ms. Williams responded that anything else would be insignificant. She testified at trial that her treating doctors kept referring to her neck, and they thought that the pain was coming from the neck causing the shoulder to hurt, but she thought it was her shoulder that was injured. Although her neck "kind of hurt," she didn't think it was anything serious despite the fact that her doctors told her she had a neck

injury and she received physical therapy for her neck. She testified that her neck and shoulder were injured in the 1984 rear-end collision, while her shoulder and low back were injured in the 1988 collision with Ms. Jacobs. Finally, she stated there was no injury to her neck in the accident with Ms. Jacobs.

Although the trial court permitted this testimony concerning Ms. Williams' injuries and the treatment she received from Dr. Schoolman, the trial court sustained Ms. Jacobs' foundation objection and excluded Ms. Williams' testimony of the diagnoses and treatments of Drs. Williams and Davuluri. The court also excluded the medical records and bills of Drs. Williams and Davuluri, as well as the records and bills from diagnostic tests ordered by these doctors. With respect to this evidence, the trial court allowed Ms. Williams to make an offer of proof.

During this offer of proof, Ms. Williams testified that she saw Dr. Williams three days after her accident with Ms. Jacobs. She told Dr. Williams that she had been involved in a car accident and that she was suffering pain in her back and shoulder. Dr. Williams prescribed a course of treatment comprised of ultrasound, heat pack and massage therapy. Ms. Williams underwent fifty-two treatments prescribed by Dr. Williams between December 27, 1988 and February 16, 1989. During this time period, Ms. Williams also purchased medication and a cervical collar Dr. Williams prescribed for her. By the end of her treatment, Dr. Williams concluded that Ms. Williams was suffering a form of nerve damage and referred her to Dr. Davuluri, a neurologist. Dr. Davuluri had Ms. Williams undergo traction therapy for her neck and low back and had an MRI performed on her. Ms. Williams saw Dr. Davuluri during the time period of February to April of 1989. In April of 1989, Dr. Davuluri suspected that Ms. Williams had a herniated disk and referred her to another neurosurgeon, Dr. Schoolman.

Ms. Williams also testified during the offer of proof that in the wake of the accident, she paid Dr. Williams $4,190 for x-rays, hydrocol-

lation treatments to her back and neck, therapeutic ultrasound treatments, and medical evaluations. In addition, she paid $55 for an EMG test and $636 for a CT scan and $167 for other spinal services. With regard to Dr. Davuluri, Ms. Williams paid $310 for a variety of nerve conduction tests, $240 for several office visits, $825 for an MRI test and $4,589.45 for physical therapy services provided by Research Belton Hospital.[2] Ms. Williams also testified that she paid smaller amounts for various miscellaneous items, such as a lumbar roll and other treatments. When totaled, Ms. Williams testified that she paid $12,467.55 for medical treatment while under the care of Drs. Williams and Davuluri. All of these charges were documented by medical bills, statements and receipts which Ms. Williams presented during the offer of proof. The trial court denied the offer of proof and the accompanying exhibits.

■ Ms. Williams' burden of proof in her personal injury action was to show by substantial evidence that she was injured and that a causal connection existed between that injury and the accident. *Almon v. Black,* 611 S.W.2d 368, 370 (Mo.App.1981). Both these elements must be satisfied before recovery may be made for damages such as medical expenses and bills. Therefore, we examine the offer of proof to determine whether Ms. Williams satisfied her burden of proof.

■ In this case, Ms. Williams testified that she was injured. She also presented the deposition testimony of Dr. Schoolman that the tests he ordered indicated that there was a soft tissue injury to Ms. Williams' neck and lower back. He further testified that, within a reasonable degree of medical certainty, Ms. Williams' injuries were the result of her accident with Ms. Jacobs. Although Dr. Schoolman's testimony would be sufficient to establish a causal connection, his deposition was read into the record after Ms. Williams made her offer of proof concerning the treatment she received from Drs. Williams and Davuluri. She did not reoffer her testimony after Dr. Schoolman's deposition was read.

Therefore, the determination of whether there was a sufficient causal connection must be made on the basis of the evidence before the trial court at the time her ruling was made. Dr. Schoolman's testimony cannot be relied upon to establish a causal connection between the accident and Ms. Williams' injuries.

■ It is not essential to have medical testimony, however, as a causal connection between an accident and injury can be inferred in cases where there is a visible injury, or a sudden onset of an injury, or "an injury that as a matter of common knowledge follows the act." *See Harris v. Washington,* 654 S.W.2d 303, 306 (Mo.App.1983). A visible injury is one in which there is evidence of an obvious wound, such as a cut, bruise, or immediate bleeding. *Bertram v. Wunning,* 385 S.W.2d 803, 806 (Mo.App.1965). Ms. Williams did not have a visible injury after the accident with Ms. Jacobs.

■ Under the sudden onset doctrine, a causal connection may be inferred if the injury "develops coincidentally with the negligent act, such as broken bones ..., immediate, continuing back pain ..., or an obvious wound...." *DeMoulin v. Kissir,* 446 S.W.2d 162, 165 (Mo.App.1969). The testimony of a lay witness is sufficient to establish the nature, cause and extent of an injury "when the facts fall within the realm of lay understanding." *Griggs v. A.B. Chance Company,* 503 S.W.2d 697, 704 (Mo.App. 1973). *See also Pedigo v. Roseberry,* 340 Mo. 724, 102 S.W.2d 600, 606–07 (1937); *State ex rel. Burcham v. Drainage District No. 25,* 272 S.W.2d 712, 716–17 (Mo.App.1954). However, when the injury is a "sophisticated injury, which requires surgical intervention or other highly scientific technique for diagnosis, and particularly where there is a serious question of pre-existing disability and its extent, the proof of causation is not within the realm of lay understanding...." *Griggs,* 503 S.W.2d at 704. *See also Goleman v. MCI Transporters,* 844 S.W.2d 463, 466 (Mo.

---

**2.** Dr. Schoolman testified that the charges for his services and the tests and treatments he prescribed were reasonable and medically necessary, including two medical bills totalling

$4,589.45 for physical therapy and x-ray services provided by Research Belton Hospital. Therefore, this evidence was before the jury.

App.1992); *Handshy v. Hasty,* 444 S.W.2d 48, 53 (Mo.App.1969).

■ Generally, "[l]ocalized pain or soreness occurring immediately or with only short delay is sufficient to fit within the rule." *Tucker v. Wibbenmeyer,* 901 S.W.2d 350, 351 (Mo.App.1995). When back pain is involved, however, the determination of whether the sudden onset doctrine applies depends greatly on the facts of each case. For example, in *Berten v. Pierce,* 818 S.W.2d 685, 687 (Mo.App.1991), the sudden onset doctrine established causation when plaintiff testified to severe pain which followed immediately after an accident and then followed "a clear and uninterrupted evidentiary track" throughout the case. The appellate court recognized that "some of the plaintiff's symptoms and conditions in evidence could very likely not be related to the ... collision without expert testimony of the causal relationship" and should have been excluded upon proper objection, but found that plaintiff's testimony went in without objection. In addition, the case was distinguished from other cases where pre-existing injuries precluded application of the sudden onset doctrine, because even though plaintiff had whiplash-like injuries in two separate accidents, both accidents were the result of the same defendant's negligence and both were subjects of the suit. *Id.* at 686–87.

In another case, the element of causation was established under the sudden onset doctrine when plaintiff testified that her symptoms of headache, back pain, visual impairment and nausea appeared three or four days after an auto accident and there was no evidence of a pre-existing or intervening cause. *Pruneau v. Smiljanich,* 585 S.W.2d 252, 255–56 (Mo.App.1979). But, dizziness, headaches, and back and neck pain beginning after a collision have also been found to be "too indefinite for a jury to determine whether the alleged injuries were caused by defendant's negligence." *Pihsiou Hsu v. Mound City Yellow Cab Co.,* 624 S.W.2d 61, 63 (Mo. App.1981). In *Pihsiou Hsu,* the court held that "[e]vidence of medical expenses and subjective complaints of pain will not suffice in proving the existence or nature of an alleged injury which is not readily discernable." *Id.*

■ Here, Ms. Williams failed to establish a causal connection between the accident and her injuries under the sudden onset doctrine. While Ms. Williams presented evidence that she felt the onset of pain concurrently with the accident, the facts presented take the nature, cause and extent of her injuries outside the realm of lay understanding. Ms. Williams' testimony regarding where she felt pain and which part of her body she believed she injured was unclear. She testified that she immediately began to experience pain in her neck, shoulder and low back which she felt continuously until a subsequent vehicle accident in November of 1989. Although she testified to an original generalized pain, by April 1989, she had a tightening sensation or pain in her low back, with a continuous pain radiating down her right leg. Generalized pain and any subsequent pain which did not develop coincidentally with the accident are not covered by the sudden onset rule. *Tucker,* 901 S.W.2d at 351.

Furthermore, Ms. Williams testified that she thought she had injured her shoulder and her low back, but her doctors kept telling her that an injury to her neck was causing her pain. Nevertheless, she testified without equivocation that she did not injure her neck in the accident with Ms. Jacobs. This is significant because Ms. Williams had been involved in a previous vehicle accident in 1984 where she sustained an injury to her neck and shoulder. As a result of the 1984 wreck, she suffered problems with her neck and shoulder for two years. Ms. Williams' insistence that her neck was not reinjured in the accident with Ms. Jacobs raises questions concerning the nature of her injury because the proffered evidence was that the doctors' treatment was focused on an injury to her neck.

In addition, the doctors who treated her differed in their diagnoses despite the fact that they utilized sophisticated scientific testing. Dr. Williams concluded at the end of his treatment of Ms. Williams that she was suffering from a form of nerve damage, and he referred her to Dr. Davuluri, a neurologist. The results of x-rays, an electromyogram and a CT lumbar scan ordered by Dr. Davu-

luri caused him to suspect a herniated disk. He referred Ms. Williams to Dr. Schoolman because he believed surgical intervention might be required. Although Dr. Schoolman's deposition testimony came into evidence after the trial court denied Ms. Williams' offer of proof, it bolsters the court's ruling that the sudden onset doctrine should not apply. Dr. Schoolman's diagnosis, after having a CT scan of her neck and lower back areas, an electromyogram and additional x-rays, was that Ms. Williams suffered from a soft tissue injury. Considering that the nature of her injury was not readily apparent to her treating physicians and she had a pre-existing injury, Ms. Williams' lay testimony was insufficient to satisfy her burden of establishing a causal connection between the accident and her injuries. The trial court did not abuse its discretion in denying her offer of proof concerning her treatment from Drs. Williams and Davuluri.

■ There was also no error in the exclusion of Ms. Williams' medical bills for this treatment by Drs. Williams and Davuluri. " 'Recovery for medical expenses incurred as a result of a defendant's negligence in a personal injury action depends upon proof of the necessity and reasonableness of the medical expenses incurred.' " *Hollis v. Blevins*, 927 S.W.2d 558, 569 (Mo.App.1996) (quoting *Hagedorn v. Adams*, 854 S.W.2d 470, 477 (Mo.App.1993)). This must be proven by substantial evidence. *Wise v. Towse*, 366 S.W.2d 506, 508 (Mo.App.1963). In determining whether there is substantial evidence of the medical necessity and reasonableness of the proffered medical expenses, this court applies a two-part test. *Briggs v. Baker*, 631 S.W.2d 948, 952 (Mo.App.1982). First, "there must be substantial evidence that the charges themselves were reasonable and [second] there must be substantial evidence that the charges represent services which were reasonably necessary to treat, alleviate, or cure injuries sustained as a result of the accident. . . ." *Id.*

■ This court first considers whether Ms. Williams satisfied her burden of proving that the medical charges were reasonable. The evidence that Ms. Williams paid the medical bills related to her treatment by Drs.

Williams and Davuluri is substantial evidence of the reasonableness of the charges. *Hughes v. Palermo*, 911 S.W.2d 673, 675 (Mo.App.1995). It is presumed that if the charges were not·reasonable, Ms. Williams would not have paid them. *Wise*, 366 S.W.2d at 508. Therefore, Ms. Williams met her burden of proving that the excluded medical charges were reasonable.

■ It was also necessary that Ms. Williams prove the medical necessity of the medical services and expenses arising from the treatments of Drs. Williams and Davuluri. In that regard, Ms. Williams offered no direct testimony that the medical expenses and services at issue were medically necessary as a result of her accident with Ms. Jacobs. This is not fatal to her claim because the necessity of medical services and expenses may be inferred from the evidence, in addition to being proved by direct evidence. *See id.; Hay v. Ham*, 364 S.W.2d 118, 126 (Mo.App.1962). In *Wise* and *Hay*, the courts made the inference that the medical treatment was medically necessary. Although the treating physicians did not testify that the treatment they rendered was medically necessary, the circumstances of these cases created the inference of necessity. For example, in *Wise*, the appellate court found it was erroneous to withdraw from the jury the cost of x-rays ordered by the plaintiffs' physician. 366 S.W.2d at 508. The court determined that evidence the plaintiffs' physician prescribed x-rays upon seeing the plaintiffs after the accident created an inference that the doctor "thought these x-rays necessary to his diagnosis and treatment or presumably he would not have prescribed that they be made." *Id.*

In *Hay*, the plaintiff suffered "cuts on his head, arm and elbow; a fractured knee (left) cartilage; a fracture of the fibula of the right leg; a five to six inch cut on one side of the right leg and a puncture wound in the opposite side of the same leg." 364 S.W.2d at 125. The court found that "[t]he necessity for the medical treatment afforded plaintiff's injuries is clearly obvious from their nature and extent as detailed in the evidence," so there was "sufficient evidence to support a fair inference that plaintiff's medical ex-

penses were necessarily incurred." *Id.* at 126.

In this case, Ms. Williams did not provide substantial evidence from which the necessity of the medical treatment by Drs. Williams and Davuluri and the expenses related thereto may be inferred. She merely testified during the offer of proof that she received the medical treatment and that she paid the bills for that treatment but offered no testimony concerning the medical necessity of such treatment. Ms. Williams did not have evidence from Dr. Williams or Dr. Davuluri that they examined her and then ordered a course of treatment. Nor were the injuries which Ms. Williams sustained the type from which an inference could be made that the treatment was necessary. As a result, there was neither direct evidence nor evidence from which a reasonable inference could be made that the treatment was medically necessary. Therefore, the trial court did not err in refusing to admit the proffered exhibits into evidence. Point I is denied.

### Point II—Jury Instruction Defining Negligence

In point two, Ms. Williams claims that the trial court erred by refusing to instruct the jury on the appropriate definition of negligence. The trial court submitted the negligence definition found in MAI 11.02II rather than MAI 11.03, as suggested by Ms. Williams. Ms. Williams argues that the instruction given did not require the highest degree of care, which is the duty of care for the operation of motor vehicles under § 304.012, RSMo 1994.[3]

According to § 304.010.1, RSMo 1994, "[e]very person operating a motor vehicle on the highways of this state . . . shall exercise the highest degree of care." The highest degree of care standard is the appropriate standard of negligence in personal injury cases involving automobiles. *Hansen v. James*, 847 S.W.2d 476, 481 (Mo.App.1992), *overruled on other grounds by Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 108

(Mo. banc 1996). Here, the trial court gave the jury the definition of "negligent" found in MAI 11.02II which reads: "The term 'negligent' or 'negligence' as used in this [these] instruction[s] means the failure to use that degree of care that a very careful person would use under the same or similar circumstances." Ms. Williams argues that MAI 11.03 should have been given, which reads: "The term 'negligent' or 'negligence' as used in this [these] instruction[s] means the failure to use the highest degree of care. The phrase 'highest degree of care' means that degree of care that a very careful person would use under the same or similar circumstances." As is evident, MAI 11.03 uses identical language as MAI 11.02II when describing what degree of care is required. The trial court instructed the jury on the highest degree of care standard but used an instruction simply setting out the definition of that phrase instead of an instruction which included the phrase itself and then its definition.

The Notes on Use for MAI 11.02 state that the definition of "negligent" in MAI 11.02II is appropriate "where the law requires the highest degree of care." The Notes on Use for 11.03 provide that the definition in instruction 11.03 "*may* be used instead of MAI 11.01, and *MAI 11.02II*, in a proper case." (Emphasis added). While the trial court could have properly used 11.03 to instruct the jury, under the circumstances of this case it was equally correct to instruct the jury by the use of MAI 11.02II. As a result, the jury was appropriately instructed and Point II is denied.

### Point III—Ms. Jacobs' Closing Argument Regarding Ms. Williams' Burden of Proof

Third, Ms. Williams alleges that the trial court plainly erred by not taking corrective action during closing argument when Ms. Jacobs mischaracterized Ms. Williams' burden of proof. During closing argument, Ms. Williams argued that her bur-

3. Although the version of § 304.010.1, RSMo 1994, in effect at the time of the accident required the highest degree of care when operating a motor vehicle, the present version of that stat- ute no longer contains such language. The language of § 304.010.1, RSMo 1994, concerning the highest degree of care is now contained in § 304.012, RSMo Cum.Supp.1996.

den of proof was like a scale, in which she only had to tip the scales in her favor by 51% in order to be entitled to judgment. In her closing argument, Ms. Jacobs responded to Ms. Williams' argument by pointing out to the jury that the instruction dealing with the plaintiff's burden of proof did not mention anything about 51%. Ms. Jacobs argued that the jury should just decide who it believed and rule in that party's favor. Ms. Williams did not object to this closing argument at trial, so she is only entitled to review for plain error. Rarely will comments made during closing argument rise to the level of plain error, entitling a party to relief. *Long v. Twehous Contractors, Inc.,* 904 S.W.2d 285, 290 (Mo.App.1995). Plain error occurs in the case of closing argument if the "closing argument contains reckless assertions, unwarranted by proof and intended to arouse prejudice, which, therefore, may be found to have caused a miscarriage of justice." *Hensic v. Afshari Enterprises, Inc.,* 599 S.W.2d 522, 526 (Mo.App.1980).

In this case, Ms. Jacobs correctly argued to the jury that the jury instruction did not quantify Ms. Williams' burden of proof at 51%. MAI 3.01. Furthermore, Ms. Jacobs' argument was merely in response to what Ms. Williams had stated in her initial closing argument. "[T]he law indulges a liberal attitude toward closing argument, particularly where the comment complained of is a fair retort or responds to prior argument of opposing counsel." *Hammer v. Waterhouse,* 895 S.W.2d 95, 106 (Mo.App.1995). Here, Ms. Jacobs was responding to Ms. Williams' argument that her burden of proof was quantified at 51% when she referred the jury to the instruction which did not contain language concerning a figure of 51%. Ms. Jacobs' comments were merely retaliatory and clarifying remarks, and were a fair retort to Ms. Williams' argument. As a result, there was no error in the closing argument. Point III is denied.

### Point IV—Claim for Property Damage to Ms. Williams' Automobile

■ As her fourth claim of error, Ms. Williams contends that the trial court plainly erred by concluding that she had not pleaded a claim for property damage in the original petition. On the second day of trial, Ms. Williams attempted to amend her petition to include in her damages prayer a claim for property damage to her vehicle as a result of the accident. The trial court overruled her motion because it was "fundamentally unfair" to allow an amendment to the pleading two days into the trial without giving Ms. Jacobs adequate time to prepare a defense for the damage claim.

■ Ms. Williams did not preserve her claim of error with regard to this point because she did not raise the issue in her motion for new trial. Rule 78.07. *Hacker v. Quinn Concrete Co., Inc.,* 857 S.W.2d 402, 415 (Mo.App.1993). Therefore, this court is limited to a determination of plain error. On plain error review, this court will not overturn the trial court's actions unless there is plain error affecting substantial rights resulting in manifest injustice or a miscarriage of justice. *Glidewell v. S.C. Management, Inc.,* 923 S.W.2d 940, 953 (Mo.App.1996).

In her petition, Ms. Williams made the following claim:

At the time and place aforesaid, the Defendant Andrea Jacobs negligently, carelessly and recklessly operated her motor vehicle so as to cause or to permit said motor vehicle to collide violently with the rear of the aforesaid 1987 Escort GT vehicle being driven by Plaintiff with such force and violence *that said 1987 Escort and all parts thereof were damages [sic]* and, further causing serious, grievous, crippling and permanent personal injuries to the Plaintiff Connie Williams, thus directly resulting in damage to her as hereinafter pleaded.

(Emphasis added). Ms. Williams' petition further went on to state that as a result of Ms. Jacobs' negligence, "her entire body was wrenched, broken, bruised, displaced, contused, torn, strained and sprained." Ms. Williams also pleaded that she had to seek extensive medical treatment, miss time from her jobs and incurred substantial medical bills for the treatment of her injuries. Therefore, she sought judgment against Ms. Jacobs "for her damages in a sum in excess of Fifteen Thousand Dollars ($15,000); and

for her costs herein incurred and expended; and for such other and further relief as the Court may deem mete and just in the premises."

During her opening statement, Ms. Williams stated that it cost her $533.65 to repair the damage to her rear bumper caused by the accident and that it was "one of the items of damages that Connie Williams is asking for in this case." During Ms. Jacobs' opening statement, she informed the jury that there was no claim in Ms. Williams' petition for property damage to her car. On the second day of trial, Ms. Williams filed a motion with the court to amend her petition to state a claim for property damage in the amount of $753.65. Ms. Williams argued that her answers to interrogatories would have given notice to Ms. Jacobs of her property damages claim. The trial court refused to permit Ms. Williams to amend her petition to plead the claim because there was insufficient notice to allow Ms. Jacobs to properly investigate the claim.

■ This court holds that the trial court did not err in refusing to allow the amendment to Ms. Williams' pleading. "[T]he decision to allow or disallow amendments to pleadings is within the sound discretion of the trial court." *Lester v. Sayles,* 850 S.W.2d 858, 869 (Mo. banc 1993). The factors to be considered in this decision are: " '(1) the hardship to the moving party if leave to amend is denied; (2) the reasons for the moving party's failure to include the matter in the original pleadings; and (3) the injustice to the nonmoving party should leave to amend be granted.' " *Id.* (quoting *Hospital Dev. Corp. v. Park Lane Land,* 813 S.W.2d 904, 907 (Mo.App.1991)).

The trial court based its decision not to allow the amendment on the fact that Ms. Williams waited until the second day of the trial, making it impossible for Ms. Jacobs to properly investigate the property damage claim. Ms. Jacobs informed the court that she possessed a copy of a cancelled check in the amount of $189.63 which Ms. Williams had cashed in satisfaction of her property damages but, since it was eight years old, significant investigation would be necessary to locate it. Since the trial was expected to

end that day, Ms. Jacobs argued it would be impossible to obtain the check in time to present an adequate defense. Although Ms. Williams disputed the existence of this release, the trial court was informed that the amount of the check matched the cost of repairing Ms. Williams' car. Under the factors to be considered, the trial court did not abuse its discretion in denying Ms. Williams' motion to amend her petition.

■ Ms. Williams also claims that the trial court committed plain error by simply disregarding the plain language of the original petition and concluding that no claim for property damage was made. However, Ms. Williams' contention that the plain language of the original petition clearly stated a claim for property damage was not argued to the trial court and is contrary to her own attempt to amend the petition to include a claim for property damages. Ms. Williams' amendment constitutes an implicit admission that she had not stated a claim for property damages in her original petition. She would not have requested to amend her petition unless she agreed that she had not stated such a claim. Furthermore, Ms. Williams did not object or contradict the trial court when it specifically stated to her that the issue of property damages was not pleaded in the petition. A party "may not take advantage of error of his own making or error that is self-invited." *City of Kansas City, Inc. v. Hayward,* 954 S.W.2d 399, 403 (Mo.App. 1997). In light of these facts, the trial court did not plainly err when it found that Ms. Williams did not state a claim for property damages. Point IV is denied.

### Point V—Evidence Supporting Jury's Verdict

■ In her fifth point on appeal, Ms. Williams contends that the trial court erred in overruling her motion for a new trial because the jury's verdict is against the weight of the evidence. Ms. Williams argues that because Ms. Jacobs admitted that she rear-ended the car, the jury could not have ruled in her favor on the issue of liability and damages. Basically, Ms. Williams disagrees with the jury's verdict in favor of Ms. Jacobs.

However, Ms. Williams' point preserves nothing for appellate review. "Weighing evidence remains a trial court function, and an appellate court cannot rule on the weight of the evidence in a jury tried case." *Johnson v. Creative Restaurant Management,* 904 S.W.2d 455, 460 (Mo.App.1995). "The trial court alone has discretion to grant or deny a motion for new trial on the ground that the verdict was against the weight of the evidence." *Warren v. Thompson,* 862 S.W.2d 513, 514 (Mo.App.1993). This issue was addressed in Ms. Williams' motion for a new trial, which was denied by the trial court. The trial court found that the jury determined credibility and did not believe Ms. Williams' testimony that she was injured in the accident with Ms. Jacobs. That ruling is a conclusive determination since the appellate court does not weigh the evidence. *Veach v. Chicago & North Western Transp.,* 719 S.W.2d 767, 769 (Mo. banc 1986); *Miller v. Neill,* 867 S.W.2d 523, 529 (Mo.App.1993). Accordingly, Point V is denied.

### Point VI—Impartiality of Trial Judge

As her sixth and final point on appeal, Ms. Williams alleges that the trial court committed plain error by failing to maintain a fair and impartial appearance and demeanor during the trial of this action. Ms. Williams contends that the trial court showed partiality in favor of Ms. Jacobs by tapping her fingers in boredom during Ms. Williams' attorney's presentation and by shaking her head, making facial expressions and otherwise showing her disapproval of Ms. Williams' attorney, Howard Bodney. Ms. Williams claims that the trial court's actions prejudiced the jury against her by portraying her unfavorably.

Ms. Williams included these allegations in her motion for new trial. The trial court held a hearing on the motion. Sandra Scott, Mr. Bodney's girlfriend, testified that she had been present in the courtroom on three separate occasions during the trial. Ms. Scott testified that during the sidebar conferences the judge's tone of voice was "frustrated and scolding" with Mr. Bodney but not with Ms. Jacobs' attorney. Ms. Scott also testified that while Mr. Bodney was address-ing the trial court, the judge drummed her fingers in boredom and shook her head in disapproval. Because Ms. Williams failed to raise this issue during trial, however, our review is limited to plain error. *See Glidewell,* 923 S.W.2d at 953. Thus, we are limited to a determination of whether there is plain error affecting substantial rights resulting in manifest injustice or a miscarriage of justice. *Id.*

It is essential for a trial judge to maintain an impartial attitude in conduct and demeanor. *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 867 (Mo. banc 1993). "A judge exerts great influence over the jury, and such influence often manifests itself inadvertently." *Id.* When reviewing the claim of a trial court's lack of impartiality, we give deference to the trial court's description of what occurred in the courtroom. *Id.* at 868.

Here, the trial court overruled Ms. Williams' motion on several grounds with regard to the trial judge's allegedly inappropriate conduct during the trial. First, the trial judge expressed her belief that she had conducted herself in an impartial and unbiased manner throughout the trial. The judge indicated that at times she was frustrated with Mr. Bodney because he frequently attempted to introduce evidence immediately after she had ruled it inadmissible at one of many sidebar conferences. Second, she noted that the jury had been instructed from the beginning that nothing the judge said or did was indicative of her opinion of the facts. She further noted that there was no reason to believe the jury failed to follow this instruction. Finally, the trial judge indicated her belief that if Mr. Bodney truly believed she was behaving inappropriately, he would have brought this up with her during the course of the trial and she would have immediately given the jury a curative instruction.

This court finds significant the fact that Ms. Williams failed to raise this issue with the trial judge at the time the supposed misconduct occurred. Had she done so, the trial court would have had the opportunity to correct any perceived partiality with a curative instruction. *See French v. Missouri*

*Highway and Transp. Com'n,* 908 S.W.2d 146, 152 (Mo.App.1995). Considering Ms. Williams' failure to raise the trial court's alleged misconduct during trial, as well as the circumstances as described by the trial court, there was no error worthy of relief, plain or otherwise. Point VI is denied.

The judgment of the trial court is affirmed.

All concur.